**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

UNITED STATES OF AMERICA,
        *Petitioner-Appellee*,

v.

SANMINA CORPORATION AND
SUBSIDIARIES,
        *Respondent-Appellant.*

</td>
<td>

No. 18-17036

D.C. No.
3:15-cv-00092-
WHA

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted February 11, 2020
San Francisco, California

Filed August 7, 2020

Before: Johnnie B. Rawlinson and Consuelo M. Callahan,
Circuit Judges, and Susan R. Bolton,[*] District Judge.

Opinion by Judge Callahan

---

   [*] The Honorable Susan R. Bolton, United States District Judge for
the District of Arizona, sitting by designation.

**SUMMARY**[**]

**Tax**

The panel affirmed in part and reversed in part the district court's determination, that taxpayer Sanmina Corporation had waived attorney-client privilege and work-product protection for certain memoranda prepared in support of a worthless stock deduction on Sanmina's federal tax return, in a petition by the Internal Revenue Service to enforce a summons for those memoranda.

The memoranda in question (Attorney Memos) were authored by Sanmina's in-house counsel and referenced in a valuation report prepared by DLA Piper (DLA Piper Report) in support of the worthless stock deduction. The district court initially denied enforcement of the summons. This court remanded for *in camera* review of the Attorney Memos. On remand, the district court determined that the Attorney Memos were covered by both attorney-client privilege and work-product protection, but that those privileges had been waived. On appeal, the parties did not dispute that the Attorney Memos were privileged.

The panel first held that Sanmina expressly waived the attorney-client privilege when it disclosed the Attorney Memos to DLA Piper. The panel next held that Sanmina did not expressly waive work-product immunity merely by providing the Attorney Memos to DLA Piper, but it impliedly waived the privilege when it subsequently used the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

DLA Piper Report to support its tax deduction in an IRS audit, because such use was inconsistent with the maintenance of secrecy against its adversary. The panel ordered disclosure of only the factual content of the Attorney Memos on which the DLA Piper Report relies, and remanded for the district court to determine the specific portions of the Attorney Memos that should be disclosed to the IRS.

**COUNSEL**

Michael C. Lieb (argued) and Leemore L. Kushner, Ervin Cohen & Jessup LLP, Beverly Hills, California, for Respondent-Appellant.

Bethany B. Hauser (argued) and Deborah K. Snyder, Attorneys; Richard E. Zuckerman, Principal Deputy Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Petitioner-Appellee.

**OPINION**

CALLAHAN, Circuit Judge:

Sanmina Corporation ("Sanmina") claimed a worthless stock deduction on its federal tax return, which triggered an audit by the United States Internal Revenue Service ("IRS") of Sanmina's tax returns.  To support the deduction, Sanmina provided to the IRS a valuation report that had been prepared by DLA Piper, LLP, which in turn cited two memoranda authored by Sanmina in-house counsel.  The IRS issued a summons for the memoranda, and Sanmina objected on the basis that they were protected both by attorney-client privilege and the attorney work-product doctrine.

After the district court initially denied enforcement of the summons, the IRS appealed to this court.  We remanded for *in camera* review of the memoranda but retained jurisdiction over the appeal. *United States v. Sanmina*, 707 F. App'x 865 (9th Cir. 2017).  On remand, the district court determined that the memoranda were covered by both attorney-client privilege and work-product protection, but that those privileges had been waived.

We affirm in part and reverse in part the district court's findings.  We agree that Sanmina's disclosure of the memoranda to DLA Piper waived the attorney-client privilege.  However, such disclosure did not waive their work-product protection, except for the factual content of the memoranda.  Accordingly, we grant in part and deny in part the IRS's enforcement petition, and remand to the district court to issue a disclosure order consistent with this opinion.

I.

In its federal tax return, Sanmina claimed a worthless stock deduction arising from its ownership of shares of stock in a Swiss subsidiary, Sanmina International AG ("Sanmina AG," also referred to internally as "Swiss-3600"). The deduction totaled $503 million and offset all of Sanmina's taxable income for the 2008 tax year, with carryforward losses. The IRS subsequently initiated an examination of Sanmina's federal income tax liabilities of Sanmina Corporation and subsidiaries for the 2008, 2009, and 2010 taxable periods.

To support the worthless stock deduction, Sanmina provided the IRS with a valuation report prepared by DLA Piper (the "DLA Piper Report"), which referred to two memoranda authored by Sanmina's in-house counsel (the "Attorney Memos") in a footnote of the report. The IRS then issued a summons for the Attorney Memos. In response, Sanmina declined to produce the memoranda, invoking attorney-client privilege and attorney work-product protection. However, Sanmina agreed to disclose to the IRS the "non-privileged documents on which the analyses contained in the [Attorney Memos] are based."

A.

The DLA Piper Report is 102 pages and titled on the cover page as "Sanmina-SCI Corporation – Estimate of Fair Market Value of Sanmina International AG – Valuation as of June 30, 2009." Each page contains the label "Attorney-Client Privilege – Confidential Draft." The report begins with a two-page letter, which is addressed to Sanmina's in-house counsel, and signed by a DLA Piper partner and economist. It states in part:

> DLA Piper . . . has concluded a fair market value ("FMV") analysis supporting your assessment of insolvency of Sanmina International AG . . . . We understand our summary report will be used solely for tax compliance purposes, specifically for confirming the worthlessness of Sanmina International AG's common shares. Our estimate of value does not constitute a fairness opinion or an estimate of FMV for any other purpose and should not be relied upon as such.

The two-page letter concludes: "Based on a combination of DCF and ANA analyses, we estimate the FMV of a marketable, controlling interest in Sanmina AG to be a negative US$49 million as of the Valuation Date. The value of Subject Company's cumulative liabilities therefore exceeded the value of its assets by US$49 million."

In the report's Executive Summary, a section headlined "Nature of Engagement" states:

> Sanmina . . . has asked DLA Piper . . . to provide an estimate of the fair market value ("FMV") of 100 percent of the common stock of its wholly-owned subsidiary . . . . as of June 30, 2009 ("Valuation Date"). We understand that this analysis will be used by Sanmina's management ("Management") to make a determination of value on liquidation of Subject Company as of the Valuation Date in the context of a restructuring of Sanmina's international operations. In this content [sic], it is Management's intent to assess whether

Sanmina AG's common stock as of the Valuation Data [sic] was worthless. Furthermore, it is our understanding that Sanmina will not disclose our analysis to third parties other than its financial auditors and interested tax authorities without our expressed written consent.

The footnote referencing the Attorney Memos is found on page 56 of the report within the following paragraph:

We believed that the book value of each liability provides the best estimation of its FMV. However, based on interviews with Management and related documents provided by Management,[6] we concluded that the intercompany loan between Sanmina Holding AB and Sanmina Kista (about US$ 90 million) as well as the intercompany non-trade receivable between Sanmina-SCI and Sanmina AG [i.e., Swiss 3600] (about US$ 113 million) should be disregarded.

In the text of footnote 6 above, three documents are listed without further explanation: (1) "Memo draft: Stock and Debt Losses on Swiss-3600, March 11, 2009"; (2) "Capital Contribution Agreement between Sanmina-SCI Corporation and Sanmina International AG, July 3, 2006; and (3) "Memo: Guarantee and Capital Contribution Agreement Concerning Sanmina International AG, July 2, 2006." The first and third documents listed are the Attorney Memos at issue in this case.

B.

The Attorney Memos are described by Sanmina's in-house counsel as follows:

> The 2006 Attorney Memo is a memorandum dated July 2, 2006 from a former Sanmina tax department attorney named Chris Croudace to "File." The memorandum discusses the legal analysis supporting the execution of certain agreements among Sanmina and its subsidiaries, including the reason for those agreements, their legal enforceability, and their tax treatment. The memorandum includes citations to, and analysis of certain IRS letter rulings and two tax court decisions.
>
> . . . The 2009 Attorney Memo is a draft memorandum dated March 11, 2009. The name of the author is not apparent from the face of the document, but I was able to ascertain that the author is Mark L. Johnson, a former Sanmina tax department lawyer. Each page of the document bears the notation "Confidential – Work Product Privilege." The 2009 Attorney Memo analyzes the tax effect of the liquidation of "Swiss-3600," which is Sanmina's internal designation for Sanmina International AG. The 2009 Attorney Memo contains a factual discussion and the bulk of the memo consists of a legal analysis of those facts and their effect on the liquidation of Swiss-3600. It cites IRS revenue rulings, tax code provisions, tax

court decisions, and a decision of the U.S. Supreme Court.

A privilege log produced by Sanmina demonstrates that the Attorney Memos were shared outside of Sanmina only with Ernst & Young, KPMG, LLP, and DLA Piper. Sanmina's Director of Tax Controversy and Tactical Support, Brian Dulkie, explains in an affidavit that the Attorney Memos were "were provided to Ernst & Young . . . and KPMG to support Sanmina's taking of a worthless stock deduction" and both those firms "provided tax advice related to Sanmina's decision to take the worthless stock." According to Dulkie:

> Given the significance of that tax treatment, Sanmina proceeded with the expectation that IRS would likely call upon Sanmina to defend the worthless stock deduction. Anticipating the possibility that the Service might adopt an adverse position, Sanmina sought advice from DLA Piper, Ernst & Young and KPMG concerning the propriety of the deduction.

## C.

In January 2015, the IRS filed a petition to enforce the summons for the Attorney Memos, and the district court issued an order to show cause to Sanmina. After briefing from the parties and a hearing, the district court (Magistrate Judge Paul S. Grewal) issued an order denying enforcement of the summons, finding that the memoranda were privileged and that the privileges were not waived. The IRS appealed.

In December 2017, a panel of this court remanded the case "for the district court to review the 2006 and 2009

memos *in camera* to determine whether the documents requested by the government are privileged to any degree" and "retain[ed] jurisdiction over this appeal." *Sanmina*, 707 F. App'x at 866. In June 2018, after some dispute between the parties regarding the scope of the remand and a request for clarification from the district court, this court issued another order defining the scope of remand as: (1) whether the memoranda are privileged in the first instance and (2) whether such privilege was waived.

D.

On remand, the district court (Judge William H. Alsup) issued an order that affirmed "Judge Grewal's finding that the memoranda are protected by the attorney-client privilege and attorney work-product doctrine," but found that the privileges were "waived when Sanmina disclosed the memoranda to DLA Piper to obtain an opinion on value, then turned over the valuation report to the IRS." Based on its *in camera* review of the memoranda, the court found that they were protected both by (1) attorney-client privilege because "Sanmina sufficiently showed that the memoranda were prepared by in-house counsel, in response to a request for legal advice, and contain legal advice communicated in confidence to Sanmina executives" and (2) attorney work-product doctrine because "while there was no pending litigation when the memoranda were drafted, Sanmina reasonably anticipated that the IRS would scrutinize its $503 million stock deduction, so it engaged in-house counsel to analyze the consequences of taking such a deduction."

As to waiver, the district court concluded:

> Any attorney-client privilege that might have
> attached to the memoranda was waived when

> Sanmina voluntarily disclosed the memoranda to DLA Piper, not for the purpose of receiving legal advice, but for the purpose of determining the value of Sanmina AG's common stock. Sanmina engaged DLA Piper for the purpose of conducting a fair market value analysis to be used for tax compliance reasons. Anticipating that the IRS would adopt an "adverse position" to taking a $500 million deduction, Sanmina sought DLA Piper's services in producing the valuation report. Thus, the point of waiver took place when Sanmina provided the privileged memoranda to DLA Piper for the purpose of producing a valuation report to then turn over to the IRS. Sanmina cannot disclose a privileged attorney communication relevant to an issue of material fact, then invoke privilege to shield that communication from discovery.

The district court did not conduct a separate analysis for waiver of work-product protection apart from its discussion of waiver for attorney-client privilege but relied on *Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18 (9th Cir. 1981), as "the controlling decision in our circuit" for both issues.

Although its conclusion that waiver occurred when Sanmina disclosed the Attorney Memos to DLA Piper was "dispositive" of the waiver question, the district court also alternatively held that "Sanmina's disclosure of the DLA Piper valuation report to the IRS waived any applicable privilege as to materials used to reach the valuation." Citing Fed. R. Evid. § 502(a)(3), the district court reasoned that

because "DLA Piper's valuation report relied on the contents of the memoranda" and "based its conclusions, at least in part, on the two memoranda at issue," "[t]he analyses that informed the valuation report's conclusions should, in fairness, be considered together."  The court rejected Sanmina's argument "that the footnote merely disclosing the existence of the memoranda did not waive any applicable privilege as to their entire contents," reiterating that "it would be fundamentally unfair for Sanmina to disclose the valuation report while withholding its foundation."

## II.

The district court found—and the parties do not dispute—that the Attorney Memos constituted both privileged attorney-client communications and protected attorney work product.  Thus, the only issue before us is the question of waiver—specifically, whether Sanmina waived attorney-client privilege or work-product protection by providing the memoranda to DLA Piper and providing the DLA Piper Report to the IRS.  Because the Attorney Memos constitute attorney-client communications and protected attorney work product, we must find that Sanmina waived both privileges to mandate disclosure of the memoranda.

Whether a privilege has been waived is a mixed question of fact and law that we review de novo. *United States v. Plache*, 913 F.2d 1375, 1379 (9th Cir. 1990); *United States v. Mendelsohn*, 896 F.2d 1183, 1188 (9th Cir. 1990).  We review for clear error a district court's factual findings for attorney-client privilege and work-product doctrine. *See United States v. Richey*, 632 F.3d 559, 563–64 (9th Cir. 2011).  "A finding is clearly erroneous if it is illogical, implausible, or without support in the record." *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010).

## III.

## A.

The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice. *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981). Whether information is covered by the attorney-client privilege is determined by an eight-part test:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Graf*, 610 F.3d at 1156.

"The attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice," *Richey*, 632 F.3d at 566, as well as to communications with third parties "acting as agent" of the client. *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978). "If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist." *Richey*, 632 F.3d at 566 (citation omitted). Thus, we have recognized several contexts in which communications with attorneys for the purpose of non-legal advice are not

privileged.[1]   In general, however, "[i]f a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired 'as such' to give 'legal advice,' whether the subject of the advice is criminal or civil, business, tort, domestic relations, or anything else." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).  This "presumption is rebutted when the facts show that the lawyer was 'employed without reference to his knowledge and discretion in the law.'" *Id*.

There are "several ways by which parties may waive the privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) (citations omitted).  First, "voluntarily disclosing privileged documents to third parties will generally destroy the privilege." *Id*. at 1126–27.  Also known as an "express waiver," this type of waiver "occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).  "Disclosures that effect an express waiver are typically within the full control of the party holding the privilege; courts have no role in encouraging or forcing the

---

[1] *See, e.g.*, *United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996) (noting "[w]here the attorney was asked for business (as opposed to legal) counsel, no privilege attached," but "fact-finding which pertains to legal advice counts as 'professional legal services'" (citations omitted)); *United States v. Huberts*, 637 F.2d 630, 640 (9th Cir. 1980) ("Generally, an attorney who serves as a business agent to a client may not assert the attorney-client privilege, because no confidential relationship attaches."); *see also Harris v. United States*, 413 F.2d 316, 320 (9th Cir. 1969) (applying "the general rule that ministerial or clerical services performed by an attorney are not within the privilege").

disclosure—they merely recognize the waiver after it has occurred." *Id.*

In contrast, waiver by implication, or implied waiver, is based on the rule that "a litigant waives the attorney-client privilege by putting the lawyer's performance at issue during the course of litigation." *Id.* at 718; *see also Weil*, 647 F.2d at 24 ("[T]he federal cases presuppose that waiver may be effected by implication."). Waivers by implication rest on the "fairness principle," which

> is often expressed in terms of preventing a party from using the privilege as both a shield and a sword. . . . In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials.

*Bittaker*, 331 F.3d at 719 (citation omitted).

This fairness principle also animates the concept of subject matter waiver, in which "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *Weil*, 647 F.2d at 24; *see also Plache*, 913 F.2d at 1380 (finding disclosure of a privileged communication waived the privilege "on all other communications on the same subject"). Under this rule, "disclosure of information resulting in the waiver of the attorney-client privilege constitutes waiver 'only as to communications about the matter actually disclosed.'" *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (quoting *Weil*, 647 F.2d at 25)); *see also Mendelsohn*, 896 F.2d at 1189 (affirming decision confining testimony based on waiver to the subject of the waiver).

B.

Whether Sanmina expressly waived the attorney-client privilege over the Attorney Memos by voluntarily disclosing them to DLA Piper turns chiefly on whether Sanmina shared the memoranda with DLA Piper for the purpose of obtaining legal advice.  If Sanmina did not engage DLA Piper for its legal services, as the district court found, then DLA Piper was properly treated as a third party for the purposes of attorney-client privilege, and Sanmina's disclosure of the memos to DLA Piper expressly waived the privilege.  On the other hand, if Sanmina shared the memoranda with DLA Piper in order to secure legal advice, as Sanmina asserts, then these privileged communications were maintained within a confidential relationship between Sanmina and DLA Piper.

In finding that Sanmina disclosed the Attorney Memos to DLA Piper for a non-legal purpose, the district court reasonably relied on language from the DLA Piper Report and Dulkie's statement indicating that "Sanmina engaged DLA Piper for the purpose of conducting a fair market value analysis to be used for tax compliance reasons" and "sought DLA Piper's services in producing the valuation report." These same evidentiary sources, however, also provide inferential support for Sanmina's claim that it engaged DLA Piper as outside tax counsel and shared the privileged memoranda for the purpose of obtaining DLA Piper's legal advice.  For instance, Dulkie's statement that "Sanmina sought advice from DLA Piper . . . concerning the propriety of the [tax] deduction" after "[a]nticipating that the [IRS] might adopt an adverse position" could reasonably support the conclusion that the advice Sanmina sought from DLA Piper regarding the propriety of its tax deduction was legal

in nature.[2]    The DLA Piper Report also provides some indications of an attorney-client relationship, or at least an expectation of attorney-client confidentiality, between DLA Piper and Sanmina.[3]

Viewed in its entirety, the record might suggest that Sanmina shared the Attorney Memos with DLA Piper for the purpose of seeking both legal and non-legal advice pertaining to the propriety of its tax deduction. Communications made for such a "dual purpose" are not uncommon in the tax law context, where an attorney's advice may integrally involve both legal and non-legal analyses.[4]    While our court has not yet addressed how to

---

[2] While Dulkie does not explicitly describe the advice sought as "legal," such an inference would not be unreasonable given the undisputed fact that DLA Piper is a law firm, which comes with a "rebuttable presumption" that the firm was engaged for its legal knowledge. *See Chen*, 99 F.3d at 1502 (stating that where "attorneys were employed for their legal knowledge, to bring their clients into compliance with the law . . . [t]heir communications with their clients were . . . within the scope of the attorney-client privilege").

[3] For instance, the cover letter of the DLA Piper Report was addressed to Sanmina's in-house counsel and stated that DLA Piper had conducted a valuation analysis "supporting your assessment of insolvency of Sanmina International AG," which could be interpreted as evidence that Sanmina engaged DLA Piper to review and verify its in-house legal analysis on the insolvency of its subsidiary and its potential tax implications. The report was also signed, in part, by a firm attorney and contains "attorney-client privilege" warnings on each page, which could indicate an understanding between DLA Piper and Sanmina that its shared documents and communications were covered by attorney-client confidentiality.

[4] *See* 1 Paul R. Rice, *Attorney-Client Privilege in the United States* § 7:4 (2019) ("In a broad range of areas (e.g., tax, commercial, patent, criminal, or litigation and its avoidance), 'legal' assistance often involves

assess when a "dual purpose" communication remains within the privilege, we recognize that district courts in our circuit have grappled with this question and differed in regard to the proper test to apply.[5]  Notwithstanding this intra-circuit split, however, we need not decide the issue on the facts of this case.  Despite some evidence that Sanmina may have had a "dual purpose" for sharing the Attorney Memos to DLA Piper, the district court's finding that Sanmina's purpose was to obtain a non-legal valuation

---

many non-legal, complementary services."); *United States v. Cote*, 456 F.2d 142, 144 (8th Cir. 1972) (holding that an accountant's work papers used by the attorney in advising client were privileged where the attorney's "decision as to whether the taxpayers should file an amended return undoubtedly involved legal considerations which mathematical calculations alone would not provide" and "the accountant's aid to the lawyer preceded the advice and was an integral part of it."); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("Tax advice rendered by an attorney is legal advice within the ambit of the privilege.").

[5] Some district courts have applied a "primary purpose" test.  *See, e.g.*, *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 628 (D. Nev. 2013); *U.S. v. Salyer*, 853 F. Supp. 2d 1014, 1018 (E.D. Cal. 2012); *Premiere Digital Access, Inc. v. Central Telephone Co.*, 360 F. Supp. 2d 1168, 1174 (D. Nev. 2005); *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002).  Other courts have transported the "because of" test from the work-product context, and looked to "the totality of the circumstances" to determine "the extent to which the communication solicits or provides legal advice or functions to facilitate the solicitation or provision of legal advice."  *See In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI(EMC), 2006 WL 1699536, at *3–4 (N.D. Cal. June 16, 2006); *Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786JSW(EMC), 2004 WL 1878209, at *4 (N.D. Cal. Aug. 23, 2004) ("The Court discerns no reason why . . . for purposes of determining the discoverability of documents that have both a legal purpose and a nonlegal purpose (e.g., business purpose), the ["because of"] methodology in *In re Grand Jury Subpoena*[, 357 F.3d 900 (9th Cir. 2004),] should not be applied to the attorney-client privilege.").

analysis from DLA Piper, rather than legal advice, was not clearly erroneous because it was not "illogical, implausible, or without support in the record." *Graf*, 610 F.3d at 1157. Because its factual findings do not rise to clear error, we affirm the district court's conclusion that Sanmina expressly waived attorney-client privilege over the Attorney Memos when it disclosed the memos to DLA Piper.

Given our conclusion that Sanmina expressly waived attorney-client privilege over the Attorney Memos when they were disclosed to DLA Piper, we need not reach whether Sanmina also waived the privilege when it provided the DLA Piper Report to the IRS based on the fairness principle. But our inquiry is not over. Because we agree with the district court that the Attorney Memos constituted both privileged attorney-client communications as well as protected work product, we turn next to whether Sanmina also waived work-product protection over the memoranda.

## IV.

### A.

The work-product doctrine is a "qualified" privilege that protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989) (citing Fed. R. Civ. P. 26(b)(3)); *see also United States v. Nobles,* 422 U.S. 225, 237–38 (1975). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case," and protects both "material prepared by agents for the attorney as well as those prepared by the attorney himself." *Nobles*, 422 U.S. at 238–39. The primary purpose of the work-

product rule is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co.*, 881 F.2d at 1494.

"The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived." *Nobles*, 422 U.S. at 239. Similar to the waiver of the attorney-client privilege, a litigant can waive work-product protection to the extent that he reveals or places the work product at issue during the course of litigation. For instance, in *Nobles*, a criminal defendant's decision to present his defense investigator as a witness waived work-product privilege over the investigator's report "with respect to matters covered in his testimony." *Id.* at 236, 239. Similarly, in *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010), a party's production of an attorney's notes in support of his opposition to a motion constituted a waiver of work-product privilege over the subject matter of the notes disclosed.

Both parties posit that, unlike waivers by disclosure in the attorney-client privilege context, waivers of work-product protection require disclosing the work product to an adversary, and not merely to a third party. While the parties do not provide us a controlling decision for this proposition, we have nonetheless recognized that "there is an important distinction between the rules governing when each type of protection has been waived." *Transamerica Computer Co., Inc. v. Int'l Bus. Machines Corp.*, 573 F.2d 646, 647 n.1 (9th Cir. 1978). Although we did not further elaborate on this "important distinction" in *Transamerica Computer*,[6] we

---

[6] We found the distinction between the two types of waiver "unimportant" in *Transamerica Computer* because there, "the third person to whom the disclosure was made, a disclosure supposedly

cited a number of authorities expressing the principle that waiver of attorney-client privilege by disclosure to a third party "does not necessarily affect the work product protection since the two are designed to accomplish different results." *Ceco Steel Prod. Corp. v. H. K. Porter Co.*, 31 F.R.D. 142, 143 (N.D. Ill. 1962); *see also Vilastor-Kent Theatre Corp. v. Brandt*, 19 F.R.D. 522, 524 (S.D.N.Y. 1956)).

Since our decision in *Transamerica*, courts appear to have reached a general "uniformity in implying that work-product protection is not as easily waived as the attorney-client privilege" based on the distinct purposes of the two privileges. *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997). While the attorney-client privilege "is designed to protect confidentiality, so that any disclosure outside the magic circle is inconsistent with the privilege," work-product protection "is provided against 'adversaries,' so only disclosing material in a way inconsistent with keeping it from an adversary waives work product protection." *Id.*; *see also United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) ("Voluntary disclosure waives the attorney-client privilege because it is inconsistent with the confidential attorney-client relationship. Voluntary disclosure does not necessarily waive work-product protection, however, because it does not necessarily undercut the adversary process."). Accordingly, the overwhelming majority of our sister circuits have espoused or acknowledged the general principle that the voluntary disclosure of work product waives the protection only when such disclosure is made to an adversary or is otherwise inconsistent with the purpose of work-product doctrine—to

---

resulting in a waiver, was IBM's adversary in litigation." 573 F.2d at 647 n.1.

protect the adversarial process.**[7]**  District courts in our circuit have also applied the same principle.**[8]**

---

**[7]** *See, e.g.*, *Mass. Inst. of Tech.*, 129 F.3d at 687 ("[O]nly disclosing material in a way inconsistent with keeping it from an adversary waives work product protection."); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) ("[V]oluntary disclosure of work product to an adversary waives the privilege as to other parties."); *In re Chevron Corp.*, 633 F.3d 153, 165 (3rd Cir. 2011) ("[I]t is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product doctrine is waived."); *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) ("Although work product immunity is not automatically waived by disclosure of protected material to third parties, disclosure does waive protection if it 'has substantially increased the opportunities for potential adversaries to obtain the information.'" (citation omitted)); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 306 (6th Cir. 2002) ("Other than the fact that the initial waiver must be to an 'adversary,' there is no compelling reason for differentiating waiver of work product from waiver of attorney-client privilege." (footnote omitted)); *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 860 F.2d 844, 846 (8th Cir. 1988) ("Disclosure to an adversary waives the work product protection as to items actually disclosed . . . ." (internal quotation marks and citation omitted)); *Doe No. 1 v. United States*, 749 F.3d 999, 1008 (11th Cir. 2014) ("Disclosure of work-product materials to an adversary waives the work-product privilege."); *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) ("[D]isclosure to a third party does not waive the privilege 'unless such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary.'"); *Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed. Cir. 1990) ("Voluntary disclosure of attorney work product to an adversary in the litigation for which the attorney produced that information defeats the policy underlying the privilege . . . .").

**[8]** *See, e.g.*, *Samuels v. Mitchell*, 155 F.R.D. 195, 200 (N.D. Cal. 1994) ("[T]he work product privilege is not automatically waived by any disclosure to third persons.  Rather, the courts generally find a waiver only if the disclosure 'substantially increases the opportunity for

Thus, consistent with our sister circuits as well as precedent on the unique purposes for the work-product doctrine, we hold that disclosure of work product to a third party does not waive the protection unless such disclosure is made to an adversary in litigation or "has substantially increased the opportunities for potential adversaries to obtain the information." 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2024 (3d ed. 2020). Put another way, disclosing work product to a third party may waive the protection where "such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary." *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 605 (D.C. Cir. 2001) (internal quotation marks and citation omitted). "Under this standard, the voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection for that material." *Deloitte*, 610 F.3d at 140.

In *Deloitte*, the D.C. Circuit applied this standard in the context of a federal tax case, where the government also sought production of work product that the taxpayer company, Dow, had disclosed to its independent auditor, Deloitte. 610 F.3d at 133. There, the government argued that Dow's disclosure of its attorney work product to Deloitte waived the protection because Deloitte was either a potential adversary or a conduit to an adversary. *Id*. at 140–41. In rejecting both arguments, the D.C. Circuit provided some useful guidance on how to determine whether disclosure to an adversary, or a conduit to an adversary, has occurred.

---

potential adversaries to obtain the information.'" (citation and quotation omitted)).

Addressing whether Deloitte was a "potential adversary" to Dow, the D.C. Circuit framed the relevant question as "not whether Deloitte could be Dow's adversary in any conceivable future litigation, but whether Deloitte could be Dow's adversary in the sort of litigation the [work-product documents] address." *Id*. at 140. In concluding "that the answer must be no," the court noted that, in preparing the work product, "Dow anticipated a dispute with the IRS, not a dispute with Deloitte," and the work product concerned tax implications that "would not likely be relevant in any dispute Dow might have with Deloitte." *Id*.

As to the "conduit to an adversary" analysis, the D.C. Circuit noted that its prior applications of the "maintenance of secrecy" standard have generally involved "two discrete inquiries in assessing whether disclosure constitutes waiver." *Id*. at 141. The first inquiry is "whether the disclosing party has engaged in self-interested selective disclosure by revealing its work product to some adversaries but not to others." *Id.* If so, "[s]uch conduct militates in favor of waiver" based on fairness concerns. *Id.* The second inquiry is "whether the disclosing party had a reasonable basis for believing that the recipient would keep the disclosed material confidential." *Id.* This "reasonable expectation of confidentiality" could "derive from common litigation interests between the disclosing party and the recipient," or it "may be rooted in a confidentiality agreement or similar arrangement between the disclosing party and the recipient." *Id*.

These points of inquiry into the disclosing party's "selective disclosure" and "reasonable expectation of confidentiality"—while highly relevant and often dispositive—are not the only considerations at play in assessing whether a work-product disclosure is inconsistent

with the maintenance of secrecy against adversaries. Rather, the fact-intensive analysis requires a consideration of the totality of the circumstances and is ultimately guided by the same principle of fundamental fairness that underlies much of our common law doctrine on waiver by implication. Thus, we may find the work-product immunity waived where the disclosing party's conduct has reached a "certain point of disclosure" towards his adversary such that "fairness requires that his privilege shall cease, whether he intended that result or not." *Weil*, 647 F.2d at 24. Under the fairness doctrine however, a court must be careful to "impose a waiver no broader than needed to ensure the fairness of the proceedings before it. Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose." *Bittaker*, 331 F.3d at 720.

In light of these relevant guideposts, we turn to whether Sanmina voluntarily disclosed the Attorney Memos "to an adversary or a conduit to an adversary" either when it disclosed the Attorney Memos to DLA Piper or when it provided the DLA Piper Report to the IRS.

## B.

The question of whether Sanmina's disclosure of the Attorney Memos to DLA Piper alone qualifies as a "disclosure to an adversary" is fairly easy to answer. We conclude it does not. The government readily concedes that DLA Piper was not an adversary to Sanmina. Nor was DLA Piper a potential adversary. As *Deloitte* and other courts have held, a taxpayer's disclosure of its attorney work product to an independent auditor does not constitute disclosure to an adversary sufficient to waive the protection. *See Deloitte*, 610 F.3d at 139 ("Among the district courts that have addressed this issue, most have found no waiver.")

(citing cases). In that same vein, Sanmina's disclosure of the Attorney Memos to DLA Piper for the purpose of obtaining a valuation analysis may render DLA Piper a third party insofar as attorney-client privilege is concerned, but it does not transform DLA Piper into an adversary or even a potential adversary with respect to the memoranda. Similar to the work product at issue in *Deloitte*, the Attorney Memos were prepared in anticipation of a dispute between Sanmina and the IRS, not between Sanmina and DLA Piper, and they involve legal assessments of potential tax implications for Sanmina, which would likely be irrelevant in any potential dispute between Sanmina and DLA Piper. *Id.* at 140.

The government argues that DLA Piper was nonetheless a "conduit to an adversary" because the DLA Piper Report "was intended for disclosure to interested tax authorities" and any "expectation of confidentiality was therefore absent." The relevant inquiry, however, is not whether Sanmina expected confidentiality over the DLA Piper Report. It is whether Sanmina "had a reasonable basis for believing that [DLA Piper] would keep the [Attorney Memos] confidential" in the process of producing its valuation analysis. *Deloitte*, 610 F.3d at 141. That Sanmina shared the Attorney Memos with DLA Piper to obtain a valuation report for the IRS does not necessarily mean that Sanmina knew or should have known that the resulting DLA Piper Report would disclose or make reference to its attorney work product. If anything, Sanmina's enlistment of DLA Piper's assistance in anticipation of litigation with the IRS indicates a "common litigation interest" between Sanmina and DLA Piper insofar as the Attorney Memos are concerned. *Id*. at 142. Furthermore, as discussed earlier, some facts in the record support a reasonable belief on Sanmina's part that the Attorney Memos were maintained within a confidential relationship with DLA Piper. *See*

*supra* note 3.  On balance, the circumstances suggest that Sanmina had a reasonable expectation of confidentiality over the Attorney Memos at the time of their disclosure to DLA Piper.

There is also no indication that Sanmina was engaging in "self-interested selective disclosure" when it provided the memoranda to DLA Piper.  *Id*. at 141.  "Selective disclosure involves disclosing work product to at least one adversary." *Id.* at 142.  As we have already found and the government concedes, DLA Piper was not an adversary to Sanmina when it received the Attorney Memos, nor were any of the other entities in receipt of the memoranda.  Accordingly, we conclude that Sanmina's disclosure of the Attorney Memos to DLA Piper did not constitute a disclosure to an adversary or a conduit to an adversary sufficient to waive the work-product privilege.

## C.

Although Sanmina's disclosure of the Attorney Memos to DLA Piper in itself did not waive work-product protection, the more difficult question is whether Sanmina waived such protection when it provided the IRS with the DLA Piper Report.  Under the "disclosure to an adversary" standard, there is no dispute that the IRS is an adversary to Sanmina insofar as the Attorney Memos are concerned. However, Sanmina did not disclose the actual Attorney Memos to the IRS; rather, it disclosed a valuation report that cited to the protected memoranda.  Sanmina argues that because the DLA Piper Report did "not disclose or describe the contents of the Attorney Memos," there is no "disclosure" sufficient to waive the memoranda's work-product protection.

The concept that waiver by disclosure requires the disclosure of some "content" of a privileged document—or at least more than the fact of its existence—makes intuitive sense. It also finds support from case law.[9] This point, however, is not wholly dispositive to our waiver analysis. As we have recognized in the attorney-client privilege context, there is a difference between express and implied waivers. This framework is also applicable in the context of work-product protection, where an express waiver generally occurs by disclosure to an adversary, while an implied waiver occurs by disclosure or conduct that is inconsistent with the maintenance of secrecy against an adversary. *See In re Martin Marietta Corp.*, 856 F.2d 619, 625–26 (4th Cir. 1988) (finding a regulatory disclosure of work product "impliedly waived the work product privilege as to all non-opinion work product on the same subject matter as that disclosed" but not to opinion work product). Sanmina's claim that the DLA Piper Report does not disclose any of the content of the Attorney Memos to the IRS may foreclose a finding of express waiver in this case, but it is only one factor

---

[9] "The case law is well settled that disclosing the fact that there were confidential communications between a client and his or her attorney—or even disclosing that certain subjects confidentially were discussed between a client and his or her attorney—does not constitute a waiver by partial disclosure." *Roberts v. Legacy Meridian Park Hosp., Inc.*, 97 F. Supp. 3d 1245, 1253 (D. Or. 2015). "The disclosure must be of confidential portions of the privileged communications. This does not include the fact of the communication, the identity of the attorney, the subject discussed, and details of the meetings, which are not protected by the privilege." *Id.* (citing 2 Paul R. Rice, *Attorney-Client Privilege in the United States* § 9:30 at 153–56 (2014)). This proposition also finds inferential support from the statement in *Weil* that "voluntary disclosure of the *content* of a privileged attorney communication" constitutes subject matter waiver. 647 F.2d at 24 (emphasis added).

we consider in determining whether to find an implied waiver.

Thus, the focal point of our waiver inquiry is whether, under the totality of the circumstances, Sanmina acted in such a way that is inconsistent with the maintenance of secrecy against its adversary in regard to the Attorney Memos. More broadly, we must ask whether and to what extent fairness mandates the disclosure of the Attorney Memos in this case. While we are generally guided by the same fairness principle underlying waivers by implication in the attorney-client privilege context, the overriding concern in the work-product context is not the confidentiality of a communication, but the protection of the adversary process.

Here, Sanmina obtained a valuation report from DLA Piper in anticipation of scrutiny from the IRS over a claimed tax deduction. When asked for proof from the IRS, Sanmina responded with the DLA Piper Report—a document that expressly referred to the Attorney Memos. Presumably, Sanmina could have chosen to substantiate the deduction with other documents that did not make reference to the Attorney Memos but did not. Such conduct seems inconsistent with Sanmina's purported goal of keeping the memoranda secret from the IRS. Assuming that Sanmina reasonably expected confidentiality over the Attorney Memos when sharing them with DLA Piper, this expectation became far less reasonable once Sanmina decided to disclose to the IRS a valuation report that explicitly cited the memoranda as a basis for its conclusions. In doing so, Sanmina increased the possibility that the IRS, its adversary in this matter, might obtain its protected work product, and thereby engaged in conduct inconsistent with the purposes of the privilege.

To the extent that Sanmina implicitly waived the work-product privilege, the scope of its waiver must be "closely tailored . . . to the needs of the opposing party" and limited to what is necessary to rectify any unfair advantage gained by Sanmina from its conduct. *Bittaker*, 331 F.3d at 720. In that regard, it is not clear what unfair advantage Sanmina has gained from its conduct, or how the IRS has been unfairly disadvantaged, particularly at the current stage of proceedings. The dispute before us is whether to enforce a petition for a summons in a tax audit initiated by the IRS. The parties have not yet engaged in any formal litigation regarding the underlying validity of Sanmina's claimed tax deduction. Even if Sanmina may have temporarily reaped the benefit of its claimed tax deduction, the potential consequences of Sanmina's decision to withhold the Attorney Memos and support the deduction with a questionable valuation report ultimately bear more heavily on Sanmina than on the IRS. We disagree with the district court's conclusion that, without the disclosure of the Attorney Memos, "the IRS or any other reader would be forced to simply accept the [DLA Piper] opinion without access to the foundational material." At this audit stage, the IRS is not required to accept the conclusions in the DLA Piper Report at all. Even without access to the Attorney Memos, the IRS could still proceed with its examination of Sanmina's returns, conclude that Sanmina has failed to adequately support its claimed deduction with the DLA Piper Report and other documents provided, and disallow the deduction. *See Interstate Transit Lines v. Comm'r of Internal Revenue*, 319 U.S. 590, 593 (1943) (stating "the now familiar rule that an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer"). So long as Sanmina continues to refuse to produce the Attorney

Memos, it faces the likely risk of an unfavorable decision from the IRS in regard to its tax deduction.

The Attorney Memos, as described by Sanmina's in-house counsel and confirmed by the district court's review, contain both factual discussions of the relevant transactions and legal analyses of these facts in light of various tax law authorities. Thus, the memoranda contain both factual work product and opinion work product. Based on Sanmina's overall conduct, Sanmina has implicitly waived protection over any factual or non-opinion work product in the Attorney Memos that serve as foundational material for the DLA Piper Report. However, the IRS provides no reason why the scope of this implied waiver should encompass the opinion work product contained in the Attorney Memos. Besides its general argument the Attorney Memos are needed to understand the DLA Piper Report, the IRS does not explain why the "mental impressions, conclusions, opinions or legal theories" of Sanmina's in-house attorneys are specifically at issue or critical to its assessment of the deduction's legal validity. *Hickman v. Taylor,* 329 U.S. 495, 508 (1947). We have held that such opinion work product is discoverable only "when mental impressions are at issue in a case and the need for the material is compelling." *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992); *see also Upjohn Co. v. United States*, 449 U.S. 383, 401 (1981) ("[S]uch work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship.").

According to Sanmina, it has produced to the IRS both the DLA Piper Report as well as the underlying transactional documents on which the Attorney Memos and the DLA Piper Report relied. These disclosures, along with our ordered disclosure of the factual work product contained in

the Attorney Memos, should provide the IRS with the same underlying facts and data on which Sanmina's attorneys relied in generating the legal opinions contained in the Attorney Memos. With this information, the IRS should be able to rely on its own attorneys to analyze the relevant facts in light of the applicable tax authorities to determine the legal validity of Sanmina's tax deduction. While it might certainly be helpful to the IRS to have access to the entirety of the memoranda, this reason does not justify the IRS's entitlement to the legal theories and opinions of its potential adversary in litigation. In fact, mandating full disclosure of such protected work product under these circumstances may potentially undermine the adversary process by allowing the IRS the opportunity to litigate "on wits borrowed from the adversary" in a future legal dispute with Sanmina. *Hickman*, 329 U.S. at 516 (Jackson, J., concurring).

We conclude that fairness does not require the categorical disclosure of Sanmina's protected work product to the IRS at this stage of prelitigation. Rather, fairness requires, at most, the disclosure of the factual, or non-opinion, work product contained in the Attorney Memos upon which the DLA Piper Report relies. Any opinion work product—meaning, the attorney's "mental impressions, conclusions, opinions or legal theories"—contained in the Attorney Memos shall remain protected by the work-product doctrine.

V.

Sanmina waived the attorney-client privilege when it disclosed the Attorney Memos to DLA Piper. However, such disclosure did not automatically waive work-product protection over the Attorney Memos. Rather, waiver of work-product immunity requires either disclosure to an adversary or conduct that is inconsistent with the

maintenance of secrecy against its adversary. Under this standard, Sanmina did not expressly waive work-product immunity merely by providing the Attorney Memos to DLA Piper, but its subsequent use of the DLA Piper Report to support its tax deduction in an audit by the IRS was inconsistent with the maintenance of secrecy against its adversary. In imposing an implied waiver of the work-product privilege in this case, we conclude that the fairness principle does not require the categorical disclosure of the Attorney Memos at this stage. Rather, Sanmina's implied waiver of the work-product protection only extends to the factual portions of the Attorney Memos.

Thus, we **GRANT IN PART** and **DENY IN PART** the IRS's petition to enforce its summons. We order disclosure of only the factual content of the Attorney Memos on which the DLA Piper Report relies. We remand to the district court for the limited purpose of determining the specific portions of the Attorney Memos that should be disclosed to the IRS and ordering disclosure consistent with this opinion.