**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.21-50291 |
| *Plaintiff-Appellee*, | D.C. No. 2:20-cr-00579-SVW-2 |
| v. | |
| MARIETTA TERABELIAN, AKA Marietta Abelian, AKA Viktoria Kauichko, | OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted May 13, 2024
Pasadena, California

Filed June 27, 2024

Before: Ronald Lee Gilman,[*] Ronald M. Gould, and
Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Gilman

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel dismissed under the fugitive-disentitlement doctrine Marietta Terabelian's appeal in a case in which Terabelian removed her location-monitoring device and fled to Montenegro while awaiting sentencing.

During the time that she was a fugitive and before the FBI located her, Terabelian's attorneys filed the present appeal on her behalf.

The panel concluded that, on balance, the policy rationales underlying the fugitive-disentitlement doctrine weigh in favor of applying the doctrine on these unique facts. The panel wrote that although any concerns regarding the enforceability of the district court's judgment are obviated because of Terabelian's recapture, the justifications of deterrence, dignity of the courts, and efficiency all support dismissal of the appeal.

## COUNSEL

David M. Lieberman (argued), Christopher Fenton, and Jeremy R. Sanders, Trial Attorneys, Appellate & Fraud Sections, Criminal Division; Lisa H. Miller, Deputy Assistant Attorney General; Nicole M. Argentieri, Acting Assistant Attorney General; ; United States Department of Justice, Washington, D.C.; Bram M. Alden, Assistant United

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

States Attorney Chief; Scott Paetty, United States Attorney Deputy Chief, Major Frauds Section; Daniel G. Boyle, Assistant United States Attorney; E. Martin Estrada, United States Attorney; Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

Narai Sugino (argued) and Ethan A. Balogh, Balogh & Co. APC, San Francisco, California; Jerry Kaplan (argued), Kaplan Kenegos & Kadin, Beverly Hills, California; for Defendants-Appellants.

## OPINION

GILMAN, Circuit Judge:

Marietta Terabelian, while awaiting sentencing after being found guilty of conspiracy to commit bank and wire fraud, conspiracy to commit money laundering, and numerous individual bank-and-wire-fraud violations, removed her location-monitoring device and fled to Montenegro. During the time that she was a fugitive and before the FBI located her, her attorneys filed the present appeal on her behalf.

Terabelian argues on appeal that the district court erroneously applied a sentencing enhancement and relied on tainted information when calculating her restitution amount. The government avers that Terabelian's appeal should be dismissed under the fugitive-disentitlement doctrine. It also disputes, in the alternative, the merits of her appeal. For the reasons set forth below, we **DISMISS** Terabelian's appeal under the fugitive-disentitlement doctrine. Endeavoring to be comprehensive, however, we also conclude that Terabelian's claims on appeal are without merit. Had we

declined to apply the fugitive-disentitlement doctrine, we therefore would have affirmed the district court's sentence and restitution order.

## I. BACKGROUND

Shortly after the COVID-19 pandemic began, Congress authorized the Paycheck Protection Program and the Economic Injury Disaster Loan Program to provide emergency loan relief. Businesses seeking assistance from the programs were required to submit supporting documentation, including the business's tax forms, payroll data, number of employees, and Employer Identification Number, and the applicant's name, birthdate, and Social Security number.

In October 2020, Terabelian and her husband, Richard Ayvazyan, were stopped and detained after passing through customs at the Miami International Airport. FBI agents had begun investigating the couple in June 2020 after connecting them to a Los Angeles-based conspiracy involving fraudulent applications for millions of dollars of COVID-19 relief loans.

By the time that Terabelian and Ayvazyan were stopped in Miami, the FBI had determined that nearly 100 loans were disbursed to fake names and fake businesses with falsified records associated with Terabelian, Ayvazyan, and several other coconspirators. The couple was detained at the Miami International Airport, where FBI agents interviewed them for several hours and searched their belongings. The search produced a credit card in the name of "Viktoria Kauichko" that was in Terabelian's wallet and text messages on Terabelian's phone in which she purported to be Kauichko. Evidence discovered later in the investigation revealed that

Kauichko was in fact a Ukrainian foreign-exchange student who was last in the United States in September 2011.

Terabelian and Ayvazyan were then arrested and held in a Miami jail. A criminal complaint was filed that same day in the United States District Court for the Central District of California, alleging that the couple had engaged in an elaborate conspiracy to commit bank and wire fraud.

Terabelian made two recorded calls from the jail telephone. In the first, she spoke with a family member and stated that "me and Rich are both at the Miami Jail," and she urged the recipient to "try to clean, clean the house as much as you can." Terabelian revealed in the second call that the agents had "found a card," and she again instructed the recipient to "[c]lean the house as much as you can."

The couple appeared before a federal magistrate judge in Miami two days after their arrest and were released on bond. Shortly thereafter, FBI agents executed a search warrant, seeking evidence of the fraudulent loans at the couple's California home. A laptop, cell phones, jewelry, and gold coins were seized. Photographs of credit cards in the name of Viktoria Kauichko and numerous financial records were also recovered.

Several of the agents, moreover, reported witnessing Terabelian throwing an object into the bushes as they drove up her driveway. That object, a grocery bag containing nearly $450,000 in cash, was also seized. Just one month after being detained in Miami, Terabelian was indicted, alongside three other codefendants.

That indictment was later dismissed when a superseding indictment was filed in March 2021. Eight individuals were charged as involved in the conspiracy, including Terabelian

and Ayvazyan.  Terabelian was charged with conspiracy to commit bank and wire fraud, conspiracy to commit money laundering, aggravated identity theft, and numerous counts of bank and wire fraud.  The superseding indictment alleged that the conspirators had filed at least 151 fraudulent loan applications seeking a total of $21.9 million in COVID-19 relief loans, and that they had actually received over $18 million.

Terabelian and Ayvazyan thereafter filed four joint motions to suppress all of the evidence obtained at the Miami International Airport, alleging that the statements and physical evidence had been improperly taken in violation of their Fourth and Fifth Amendment rights.  The district court denied each motion other than the motion based on Fifth Amendment grounds, which it granted in part.  Specifically, the district court held that the Miami-based FBI agents had "actually coerced" Terabelian to disclose the passcode to her cell phone, in violation of her Fifth Amendment rights.  All evidence retrieved from Terabelian's cell phone in Miami, including the text messages in which she purported to be Kauichko, was accordingly suppressed.

Before the trial began in June 2021, four of the conspirators accepted plea deals.  Terabelian and Ayvazyan declined to do so, and instead moved the district court for relief under *Kastigar v. United States*, 406 U.S. 441 (1972), which would prevent any information obtained from compelled statements from being used against them at trial.  Because the district court had already concluded that there had been a Fifth Amendment violation, it determined that the couple was entitled to a *Kastigar* hearing, but it deferred the hearing until after trial.

At trial, the government presented evidence demonstrating that the intricate conspiracy, by which over $18 million was obtained fraudulently through falsified records and laundered through multiple bank accounts, was connected to the eight conspirators. Part of that process was the creation of "synthetic identities" used to fraudulently apply for over 100 loans. A synthetic identity is a false identity created through the combination of personally identifiable information, such as the Social Security numbers and dates of birth of real people, and fictitious information. Viktoria Kauichko was one of several synthetic identities that was used to apply for the COVID-19 relief loans. To link the Kauichko alias to Terabelian, the government pointed to four crucial pieces of evidence.

First, the government offered the credit card in Kauichko's name that was found in Terabelian's possession when she was stopped at the Miami International Airport. The government next presented text messages retrieved from Ayvazyan's phone that connected a gift for "his wife" to "Viktoria Kauichko." Third, the government offered photographs retrieved from phones that were seized during the November 2021 search of Terabelian's home. Those photographs connected Terabelian to Fiber One Media, one of the businesses through which "Kauichko" applied for COVID-19 relief loans. One such photograph depicted a text message sent from Ayvazyan in which he associated Kauichko with Fiber One Media and indicated that Kauichko was his wife. Finally, the government presented evidence demonstrating that at least $25,000 of the fraudulently obtained funds flowed from bank accounts associated with Kauichko and Fiber One Media into Terabelian's personal bank accounts.

The government also offered exhaustive evidence to establish Terabelian's complicity in the conspiracy. This evidence included the inculpatory phone calls that Terabelian made from the Miami jail, records of at least $664,169 passing through two bank accounts controlled by Kauichko, applications for COVID-19 relief funds submitted by Kauichko seeking over $1.4 million, and records for hundreds of thousands of dollars of fraudulently obtained funds being deposited into one of Terabelian's personal bank accounts and then moved to an escrow account for a down payment on a $3.25 million home in California.

After a 10-day trial, Terabelian was convicted on all of the bank-and-wire-fraud counts for which she was charged. But she was acquitted of aggravated identity theft for allegedly using her deceased father's name and information to apply for relief loans. After the trial concluded, Ayvazyan filed a motion for acquittal and/or a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. Terabelian joined in the motion, and the district court set a hearing on the motion for the same day on which the postponed *Kastigar* motion hearing was set.

"If a defendant's statements were compelled in violation of the [F]ifth [A]mendment, he is entitled to a *Kastigar* hearing, in which the government must demonstrate 'that the evidence it intends to introduce in a subsequent criminal proceeding is not tainted by exposure to the compelled statements.'" *United States v. Anderson*, 79 F.3d 1522, 1526–27 (9th Cir. 1996) (quoting *United States v. Koon*, 34 F.3d 1416, 1431 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds by* 518 U.S. 81 (1996)). The district court had previously determined that all evidence retrieved from Terabelian's cell phone in Miami should be suppressed as

fruit of compelled statements made in violation of the Fifth Amendment. But it found no basis for further relief under *Kastigar*, holding that the government had proved by a preponderance of the evidence that its knowledge of the information stored on Terabelian's phone did not impermissibly taint the investigation or trial. The motion for acquittal and/or a new trial was also denied.

Just nine days after the district court denied their post-trial motions, Terabelian and Ayvazyan removed their location-monitoring devices that were a required condition of release by Pretrial Supervision and absconded on August 29, 2021. A bench warrant was issued for their arrest, and the FBI began a search for the fugitives. In the meantime, the district court continued with proceedings and sentenced Terabelian *in abstenia* over the objections of her attorneys. Terabelian was sentenced to 72 months of imprisonment and held jointly and severally liable with the three other coconspirators who were found guilty at trial for $17.7 million in restitution.

Because Terabelian's attorneys filed her appeal while a fugitive from justice, the government moved this court to dismiss the appeal in January 2022 pursuant to the fugitive-disentitlement doctrine. Then, on February 22, 2022, almost six months after she had absconded, FBI agents located Terabelian, Ayvazyan, and another coconspirator living under fake names with falsified travel documents in Montenegro. Montenegrin authorities then arrested the trio. The United States filed a formal extradition request in April 2022. In May, this court granted the government's motion to dismiss the appeal under the fugitive-disentitlement doctrine, but it provided that Terabelian could move to reinstate her appeal if she returned to the United States by November 2022.

Terabelian quickly filed a motion to reinstate her appeal. By early August 2022, Montenegrin officials informed their counterparts in the United States that Terabelian was to be extradited. Her extradition was canceled, however, once Montenegrin authorities discovered that Terabelian had a pending criminal case in Montenegro based on her use of fraudulent travel documents to enter the country.

While Terabelian remained in Montenegrin custody pending resolution of her criminal charges there, this court reinstated the present appeal, but allowed the government to renew its argument to dismiss the appeal under the fugitive-disentitlement doctrine. Terabelian was finally extradited to the United States in mid-November 2022. The district court ordered her detained, and she has remained in federal custody ever since.

Terabelian's reinstated appeal challenges the district court's imposition of the sophisticated-means sentencing enhancement and the inclusion of one relatively small loan in the restitution amount. She also urges this court not to apply the fugitive-disentitlement doctrine as a basis to dismiss her appeal.

## II.    STANDARD OF REVIEW

We review the district court's factual findings under the clear-error standard, its construction of the United States Sentencing Guidelines de novo, and its application of the Guidelines to the facts under the abuse-of-discretion standard. *United States v. Halamek*, 5 F.4th 1081, 1087 (9th Cir. 2021). A restitution order's legality is reviewed de novo, as is the district court's valuation methodology. If the order is within statutory bounds, then the restitution calculation is reviewed under the abuse-of-discretion standard, with any factual findings reviewed under the

clear-error standard. *United States v. Dadyan*, 76 F.4th 955, 958 (9th Cir. 2023).

"A finding is clearly erroneous if it is illogical, implausible, or without support in the record." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (quoting *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2020)). And a court abuses its discretion when it "fails to 'employ the appropriate legal standards,' misapprehends the law, or 'rests its decision on a clearly erroneous finding of fact.'" *Smith v. Helzer*, 95 F.4th 1207, 1213–14 (9th Cir. 2024) (quoting *Zepeda v. INS*, 753 F.2d 719, 724–25 (9th Cir. 1983)) (cleaned up).

## III.   ANALYSIS

### A.  The fugitive-disentitlement doctrine

Federal courts "have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996), *superseded by statute on other grounds by* 28 U.S.C. § 2466. One such inherent power is commonly known as the fugitive-disentitlement doctrine. *See id.* Under that doctrine, "an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of [her] appeal." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239 (1993). The doctrine is discretionary and "grounded in equity," *Parretti v. United States*, 143 F.3d 508, 510 (9th Cir. 1998) (citing *United States v. Sharpe*, 470 U.S. 675, 681 n.2 (1985)), and "is a 'severe' sanction that we do not lightly impose." *Antonio-Martinez v. INS*, 317 F.3d 1089, 1091 (9th Cir. 2003) (quoting *Degen*, 517 U.S. at 828).

Several rationales support the application of the doctrine to dismiss an appeal. First, the doctrine exists to "prevent the entry of unenforceable judgments against absent criminal defendants." *Mastro v. Rigby*, 764 F.3d 1090, 1095 (9th Cir. 2014) (citing *Smith v. United States*, 94 U.S. 97, 97–98 (1876)). "Second, . . . an appellant's escape 'disentitles' [her] 'to call upon the resources of the Court for determination of [her] claims.'" *Degen*, 517 U.S. at 824 (quoting *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) (per curiam)). This second rationale is "a theory akin to abandonment or waiver." *Mastro*, 764 F.3d at 1095. Finally, the doctrine "serves an important deterrent function and advances an interest in efficient, dignified appellate practice." *Ortega-Rodriguez*, 507 U.S. at 242 (citing *Estelle v. Dorrough*, 420 U.S. 534, 537 (1975)).

A trio of Supreme Court cases illustrates these supporting justifications, how the doctrine is applied, and the narrow circumstances when dismissal under the doctrine is appropriate. In *Estelle*, the Supreme Court upheld the constitutionality of a Texas statute that required dismissal of an appeal if the criminal defendant was a fugitive at any point during the pendency of the appeal. 420 U.S. at 536–37. That law was applied to the defendant in *Estelle*, who had filed his appeal, fled, and was recaptured just two days later. *Id.* at 534–35. Although the enforceability of the judgment was not a concern after recapture, Texas's law "discourages the felony of escape and encourages voluntary surrenders . . . . [and] promotes the efficient, dignified operation" of the courts. *Id.* at 537.

In *Ortega-Rodriguez*, the Supreme Court limited when the doctrine may be used. The Court reversed the Eleventh Circuit's interpretation of the fugitive-disentitlement doctrine that mandated dismissal of appeals by appellants

who became fugitives after conviction but were recaptured before sentencing and appeal. *Ortega-Rodriguez*, 507 U.S. at 249. Enforceability, the dignity of the Eleventh Circuit, efficiency of the appellate process, and deterrence were less weighty when the appeal was filed after recapture. *Id.* at 244–50. What mattered was the timing of the appeal. "[F]ugitivity while a case is pending before the district court, like other contempts of court, is best sanctioned by the district court itself." *Id.* at 251. But dismissal by the court of appeals is "an appropriate sanction when a prisoner is a fugitive during the ongoing appellate process." *Id.* at 242 (internal quotation marks omitted).

The Supreme Court further reigned in the power of the fugitive-disentitlement doctrine in *Degen v. United States*, 517 U.S. 820 (1996). In 1989, Degen faced a criminal indictment and related civil-forfeiture action. *Id.* at 821. He had fled to Switzerland in 1988 before the indictment was unsealed, and the United States was unable to extradite him. *Id.* at 822. While in Switzerland, he filed an answer to the civil-forfeiture action, but the district court, citing the fugitive-disentitlement doctrine and Degen's unavailability for the related criminal case, dismissed the civil action and vested title to the properties identified in the civil action. *Id.* This court affirmed the judgment against Degen, but the Supreme Court reversed. It held that because there was no risk that a civil judgment would be unenforceable, Degen should have been permitted to participate in the action. *Id.* at 825–26.

This court has similarly narrowed the applicability of the doctrine. Three cases are particularly instructive: *Katz v. United States*, 920 F.2d 610 (9th Cir. 1990), *overruled on other grounds by Lozada v. Deeds*, 964 F.2d 956 (9th Cir.

1992), *United States v. Sudthisa-Ard*, 17 F.3d 1205 (9th Cir. 1994), and *Mastro v. Rigby*, 764 F.3d 1090 (9th Cir. 2014).

In *Katz*, the appellant fled from the United States to Norway after filing an appeal of his sentence of 7-years' imprisonment for drug crimes. 920 F.2d at 611. He remained at large for 13 years. *Id.* This court dismissed his direct appeal for lack of prosecution without applying the fugitive-disentitlement doctrine. *Id.* at 611–12 (noting, however, that "had our attention been called to Katz's [fugitive] status, we would have dismissed his direct appeal . . . on the basis of [the fugitive-disentitlement doctrine].").

Once he was extradited back to the United States, Katz filed a motion to correct, vacate, or set aside his sentence pursuant to 28 U.S.C. § 2255. *Id.* at 611. The district court determined that Katz's prior fugitive status disentitled him from further review of his sentence or conviction, so it dismissed his motion. *Id.* Katz appealed the dismissal to this court, where the government argued for a strict application of the fugitive-disentitlement doctrine as the Second Circuit had done in *United States v. Persico*, 853 F.2d 134 (2d Cir. 1988). *Id.* at 612.

In *Persico*, the Second Circuit dismissed the appeal of a recaptured fugitive who filed his appeal once back in custody. *Id.* But this court declined to follow such a harsh approach, noting that, although it is "usually appropriate" to dismiss the appeal of a current fugitive, "Katz's appeal and his fugitive status are not contemporaneous events." *Id.* at 612–13.

Both Katz's direct appeal and his § 2255 motion challenged his underlying conviction and sentence, but his direct appeal had already been dismissed and his § 2255 motion was filed *after* he was recaptured. *Id.* at 611. This

court further cautioned that expansion of the doctrine should be done "only with great caution" because Congress is better suited to determine what effect flight and recapture should have on "further judicial proceedings," and "the disentitlement doctrine may well bar otherwise meritorious claims." *Id.* at 613. Given these reasons, this court declined to "follow *Persico* to broaden and make the disentitlement doctrine apply when the person seeking judicial relief is no longer a fugitive." *Id.*

*Katz* was decided three years before *Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993). And in *United States v. Sudthisa-Ard*, 17 F.3d 1205 (9th Cir. 1994), this court attempted to reconcile the two. In *Sudthisa-Ard*, the appeal of a former fugitive filed after recapture was dismissed. *Id.* at 1206. Sudthisa-Ard fled the day before his criminal trial concluded and evaded capture for 13 years. *Id.* He was found guilty *in absentia*, sentenced after recapture, and then filed a timely appeal. *Id.* His codefendant, who did not flee, was convicted and sentenced, but released after his conviction was overturned on Confrontation Clause grounds. *Id.* The long delay between Sudthisa-Ard's conviction and his appeal "resulted in the loss or destruction of all of the documents in the case," making retrial nearly impossible, which offended the court's dignity. *Id.* at 1207. And preparation for his appeal required this court to expend considerable resources, frustrating the court's efficiency. *Id.*

Like Sudthisa-Ard, Katz had also been at large for 13 years before recapture and subsequent appeal. To account for the different result, the *Sudthisa-Ard* court noted that (1) Katz had no codefendant and there was less interference with the appellate process in his case; (2) Katz appealed only the denial of his § 2255 motion seeking resentencing, whereas Sudthisa-Ard sought a retrial; and (3) *Katz* would

have been decided differently had *Ortega-Rodriguez* predated it. *Id.* at 1208. This court thus determined that "*Ortega-Rodriguez* necessitates the interpretation that *Katz* permits, but does not require, review of a recaptured defendant's appeal." *Id.* As a result, Sudthisa-Ard's appeal was dismissed under the fugitive-disentitlement doctrine, and this court ensured that he would "not benefit from his thirteen years of misbegotten freedom." *Id.*

In *Mastro v. Rigby*, 764 F.3d 1090 (9th Cir. 2014), the most recent Ninth Circuit case on point, this court considered whether a district court hearing a bankruptcy appeal properly dismissed the appeal under the fugitive-disentitlement doctrine. *Id.* at 1092. Mastro had fled with her husband to France after appealing the entry of a bankruptcy judgment against her. *Id.* She was soon apprehended, but France denied requests for extradition, and Mastro was indicted on related criminal charges. *Id.* The district court dismissed Mastro's appeal of the bankruptcy action by applying the fugitive-disentitlement doctrine. *Id.*

This court, highlighting the Supreme Court's analysis in *Degen*, noted that "the fugitive disentitlement doctrine should be narrowly applied and subject to significant scrutiny outside of the direct criminal appeal context." *Id.* at 1096. Mastro had flouted judicial authority while a fugitive from pending criminal charges, but she had not offended the dignity of the bankruptcy court, whose order was before the district court on appeal. *See id.* Because the "dismissal of Mastro's bankruptcy appeal was based solely on her blatant disregard for the authority of the [criminal] judicial system," the district court was found to have abused its discretion in dismissing her appeal. *Id.* (cleaned up).

In sum, both the Supreme Court and this court advise that the fugitive-disentitlement doctrine should be applied only in exceptional circumstances where dismissal is warranted. There are three critical questions to answer in determining whether to apply the doctrine. First, is the appeal a direct criminal appeal? *See Mastro*, 764 F.3d at 1096 (noting that the doctrine "should be narrowly applied . . . outside of the direct criminal appeal context"). The second question is whether the appellant was a fugitive "during the pendency of [her] appeal"? *See Ortega-Rodriguez*, 507 U.S. at 239; *Sudthisa-Ard*, 17 F.3d at 1206. And third, do the traditional justifications of abandonment, deterrence, dignity of the courts, efficiency, and enforceability support dismissal? *See Degen*, 517 U.S. at 824 (discussing the justifications); *Mastro*, 764 F.3d at 1095 (same).

Answering the first two questions in this case is straightforward. Terabelian has filed a direct criminal appeal, and she filed that appeal while a fugitive from justice. The answer to the third question is less obvious. Unlike the typical case where the doctrine has been applied, Terabelian's counsel filed this appeal on her behalf while she was a fugitive, and she is now back in the custody of the federal courts. Those circumstances muddy the waters. But, on balance, we conclude that the policy rationales underlying the fugitive-disentitlement doctrine weigh in favor of applying the doctrine on these unique facts.

We start with enforceability. Terabelian is back in custody in the United States. Because Terabelian has been recaptured, we are confident that the court will be able to enforce a judgment against her. That consideration weighs against dismissing her appeal pursuant to the fugitive-disentitlement doctrine.

But efficiency of the appellate process cuts in favor of dismissal. Recapturing Terabelian involved (1) the FBI tracing an IP address to Montenegro after a synthetic identity associated with the conspiracy logged into a bank account that the FBI was monitoring, (2) investigation by Montenegrin authorities, (3) the United States government submitting a formal extradition request, and (4) criminal judicial proceedings in Montenegro. This "flurry of extraneous matters" required this court to "divert its attention from the merits of the case before it" for over a year. *See Ortega-Rodriguez*, 507 U.S. at 245. Such a delay in "the 'efficient . . . operation' of the appellate process" should not be tolerated. *Id.* (quoting *Estelle v. Dorrough*, 420 U.S. 534, 537 (1975)).

Deterrence also favors dismissal. Terabelian's actions are precisely the kind of behavior that courts applying the doctrine have sought to deter. *See Parretti v. United States*, 143 F.3d 508, 510–11 (9th Cir. 1998) (citing deterrence as a basis to dismiss the appeal of a defendant who fled while his appeal was pending before this court). In the criminal-appeal context, "[f]ederal courts do not play 'catch me if you can.'" *United States v. Martirossian*, 917 F.3d 883, 885 (6th Cir. 2019). Contrary to her claims that she involuntarily fled to Montenegro, Terabelian clearly made a "deliberate attempt to evade [her] day of reckoning." *See Sudthisa-Ard*, 17 F.3d at 1208 (quoting *United States v. Matista*, 932 F.2d 1055, 1058 (2d Cir. 1991)). Dismissal of her appeal under the doctrine will therefore deter similar behavior by future defendants.

"[A]n interest in . . . dignified appellate practice" is likewise advanced by dismissal. *Ortega-Rodriguez*, 507 U.S. at 242 (citing *Estelle*, 420 U.S. at 537). Terabelian is pursuing a criminal appeal, and she flouted this court's

authority by filing her appeal while still a fugitive. *See id.* at 246 ("[A]n appellate court may employ dismissal as a sanction when a defendant's flight operates as an affront to the dignity of the court's proceedings."); *see also Gao v. Gonzales*, 481 F.3d 173, 177 (2d Cir. 2007) ("Litigants who abscond in the midst of an ongoing appeal defy the authority of the very court from which they seek relief.").

Finally, Terabelian's appeal and her fugitive status were largely overlapping. Whether a defendant's appeal and fugitive status are entirely or mostly contemporaneous is a factor that courts consider when deciding whether to dismiss an appeal. *See United States v. DeValle*, 894 F.2d 133, 134–36 (5th Cir. 1990) (dismissing an appeal filed while the appellant was a fugitive, but who was recaptured just 15 days after his flight); *United States v. Puzzanghera*, 820 F.2d 25, 25–27 (1st Cir. 1987) (dismissing the appeal of a fugitive who escaped custody during the pendency of the appeal, but was recaptured 35 days later).

Beyond challenging the traditional justifications undergirding the doctrine, Terabelian argues the purported equities of her case. She posits that she is not solely responsible for any delay to the appellate process in this case. But this argument brazenly overlooks her own actions. Her flight to Montenegro caused a delay of nearly six months as authorities attempted to locate her and process her extradition. And because she entered Montenegro with falsified travel documents, she faced criminal charges there, causing more time to lapse. "Recaptured involuntarily under an assumed name in a distant city after violating" the conditions of her release, Terabelian "has few if any equities to argue." *See Puzzanghera*, 820 F.2d at 27.

She further argues that applying a judge-made rule like the fugitive-disentitlement doctrine denies her statutory right to appeal.  *See* 18 U.S.C. §§ 3732, 3742.  But this court has clearly addressed her argument:  "It has been settled for well over a century that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal.'"  *Sudthisa-Ard*, 17 F.3d at 1206 (quoting *Ortega-Rodriguez*, 507 U.S. at 239).  "Those who invoke our appellate jurisdiction must take the bitter with the sweet: They cannot ask us to overturn adverse judgments while insulating themselves from the consequences of an unfavorable result."  *Antonio-Martinez v. INS*, 317 F.3d 1089, 1093 (9th Cir. 2003).

If the result were otherwise, then defendants like Terabelian would find themselves in a win-win situation.  A successful escape from justice would mean that they would never suffer the consequences of their criminal conduct.  But if they were unfortunate enough to be recaptured and returned to the jurisdiction that convicted them, then they would still win by being able to pursue their appeal as if they had never become a fugitive in the first place.  Such a "heads I win, tails you lose" scenario is totally at odds with the goals of deterrence and respect for the appellate process.

Unlike the facts in *Degen v. United States*, 517 U.S. 820 (1996), and *Mastro v. Rigby*, 764 F.3d 1090 (9th Cir. 2014), the present case concerns a direct criminal appeal and not a related civil proceeding.  Also unlike the defendant's appeal in *Katz v. United States*, 920 F.2d 610 (9th Cir. 1990), Terabelian's appeal was filed while she was a fugitive from justice, and the overlap was sizable.  Similar overlaps were critical to dismissal in both *Estelle v. Dorrough*, 420 U.S. 534, 534–35 (1975), and *Ortega-Rodriguez v. United States*, 507 U.S. 234, 249 (1993).

So, although any concerns regarding the enforceability of the district court's judgment are obviated because of Terabelian's recapture, the justifications of deterrence, dignity of the courts, and efficiency all support dismissal pursuant to the fugitive-disentitlement doctrine. *See Ortega-Rodriguez*, 507 U.S. at 240–47 (discussing the rationales supporting the doctrine). Having considered these weighty concerns with the unique facts of this case, we conclude that Terabelian "should not benefit from [her months] of misbegotten freedom." *See Sudthisa-Ard*, 17 F.3d at 1208. We therefore dismiss this appeal pursuant to the fugitive-disentitlement doctrine.

## B. Terabelian's claims on the merits

Although we dismiss Terabelian's appeal under the fugitive-disentitlement doctrine, we recognize that "the disentitlement doctrine may well bar otherwise meritorious claims." *See Katz*, 920 F.2d at 613. Such is not the situation in the present case. So for whatever cold comfort it might be for Terabelian, we have elected to briefly address the merits of her appeal.

### 1. *Sophisticated-means sentencing enhancement*

Section 2B1.1(b)(10)(C) of the United States Sentencing Guidelines (the Guidelines) provides for a two-level enhancement to a defendant's Guidelines' base offense level if "the offense . . . involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* cmt. n.9. One example of sophisticated means contemplated by the Guidelines is "hiding assets or transactions, or both, through the use of

fictitious entities." *Id.* A 2015 amendment to § 2B1.1 makes clear that, for the enhancement to apply, the defendant herself must have "intentionally engaged in or caused the conduct constituting sophisticated means." § 2B1.1 amend. 792.

The examples of sophisticated means provided in the Guidelines are nonexhaustive. This court routinely emphasizes that "[c]onduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement.'" *United States v. Jennings*, 711 F.3d 1144, 1145 (9th Cir. 2013). The sophisticated-means enhancement has been applied in a number of financial-fraud cases. *See, e.g.*, *United States v. Augare*, 800 F.3d 1173, 1175–76 (9th Cir. 2015) (applying the enhancement where a defendant took "coordinated and repetitive steps . . . to transfer money" from one account "to his personal bank account"); *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (applying the enhancement because "the complicated and fabricated paper trail made discovery of [the] fraud difficult."); *Jennings*, 711 F.3d at 1145 ("Defendants' effort to conceal income by using a bank account with a deceptive name was sufficiently sophisticated to support application of the sentencing enhancement.").

There is ample evidence in the record that supported the district court's application of the enhancement to Terabelian's sentence. Just like in the case of one of her coconspirators, "[w]hile the district court did not expressly make particularized findings when applying the [sophisticated-means enhancement], it made the required findings when conducting its section 3553(a) analysis." *United States v. Ayvazyan*, No. 21-50302, 2023 WL 5013366, at *2 (9th Cir. Aug. 7, 2023).

The district court concluded that Terabelian "knew what was going on . . . [,] knew this was an extensive fraud[,] and . . . she knew the methodology." Terabelian's possession of the Kauichko credit card showed that "[s]he was somehow involved with using that name to perpetuate the fraud." The court further pointed to Terabelian instructing others to "clean" her house after being arrested in Miami and her throwing $450,000 in cash out of a window as the FBI closed in on her. With all of this in mind, the district concluded that the "fraud was raw and horrendous unlike any other fraud" that it could remember presiding over.

Although Terabelian's actions do not reveal "exceptional brilliance," *see Jennings*, 711 F.3d at 1145, they reveal as a whole that Terabelian "intentionally engaged in . . . conduct constituting sophisticated means." *See* U.S.S.G. § 2B1.1(b)(10)(C); *see also United States v. Ouedraogo*, 824 F. App'x 714, 724 (11th Cir. 2020) ("'[T]he totality of these activities carried out over an extended period of time' was 'sufficient to support' the court's application of the enhancement.") (quoting *United States v. Ghertler*, 605 F.3d 1256, 1267–68 (11th Cir. 2010)).

Indeed, Terabelian's intentional participation in the scheme to "use . . . fictitious entities" is the kind of sophisticated means precisely contemplated by the Guidelines. *See* U.S.S.G. § 2B1.1 cmt. n.9. Furthermore, as the district court determined, Terabelian might not have been the mastermind in executing the conspiracy to defraud the government of nearly $18 million in COVID-19 relief funds, but she certainly "knew what was going on" and was a willing participant in furthering the scheme. We would therefore have affirmed the judgment of the district court and found that it did not abuse its discretion in applying the sophisticated-means sentencing enhancement had we not

dismissed Terabelian's appeal on the basis of the fugitive-disentitlement doctrine.

### 2. *Restitution amount*

This leaves us with the final issue on appeal—the restitution order. Terabelian's restitution order was issued pursuant to 18 U.S.C. § 3663A, which is known as the Mandatory Victims Restitution Act (MVRA). The MVRA requires district courts to order that defendants "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). District courts must order restitution "in the full amount of each victim's losses." *Id.* § 3664(f)(1)(A). In deciding the appeal of another of Terabelian's coconspirators, this court noted that "[w]here a defendant is convicted of conspiracy, the [MVRA] authorizes a district court to hold the defendant jointly and severally liable 'for *all* [victims] harmed by the *entire* scheme." *United States v. Dadyan*, 76 F.4th 955, 958 (9th Cir. 2023) (emphasis in original) (quoting *United States v. Riley*, 335 F.3d 919, 931 (9th Cir. 2003)).

Terabelian was held jointly and severally liable for over $17.7 million in restitution. Her challenge on appeal, however, relates only to the inclusion of a fraudulently obtained $146,800 loan disbursed to "Camilo Amaya" (the Amaya loan) on the grounds that the government discovered evidence of that loan through actions that the district court determined violated Terabelian's and Ayvazyan's Fifth Amendment rights. The rule announced in *Miranda v. Arizona*, 384 U.S. 436 (1966), "protects against violations of the Self-Incrimination Clause" of the Fifth Amendment. *United States v. Patane*, 542 U.S. 630, 634 (2004). This results in the exclusion of the "physical fruit of actually coerced statements." *Id.* at 644. But "[t]he right against self

incrimination . . . is personal to the witness. And only the witness may assert it or waive it." *United States v. Le Pera*, 443 F.2d 810, 812 (9th Cir. 1971) (internal citations omitted).

The district court concluded that Terabelian's and Ayvazyan's disclosure of their cell-phone passcodes was involuntary and thus in violation of *Miranda*. Evidence of the Amaya loan, however, came from the search of a "phone in [the] name of Iuliia Zhadko." The name "Iuliia Zhadko" was a synthetic identity used by Ayvazyan. And the phone seized from Ayvazyan in Miami was the phone in Zhadko's name. Thus, the record supports the conclusion that all evidence for the Amaya loan stemmed from information collected from the phone seized from Ayvazyan at the Miami International Airport.

The government violated Ayvazyan's Fifth Amendment rights when it coerced him into divulging his passcode. He was the "witness" who made the coerced statements regarding the Amaya loan and, as such, only he "may assert" his Fifth Amendment right to have such tainted evidence excluded. *See Le Pera*, 443 F.2d at 812.

Nevertheless, Terabelian argues that she may pursue her argument for two reasons. She first asserts that the marital privilege protects against one spouse being coerced to testify against the other. Second, she claims that because she "was a party to the same violation of Fifth Amendment rights" as her husband, she is not a third party who is unable to challenge the inclusion of the loan. Both arguments fall short.

Like her husband, Terabelian suffered a violation of her Fifth Amendment rights when the FBI agents impermissibly coerced her into providing access to her cell phone. But she

could not have been a party to the same violation as her husband because the FBI seized both her phone and Ayvazyan's. In doing so, the FBI separately compelled Ayvazyan's password from him. The rights of each were thus violated, albeit separately.

Federal common law recognizes the existence of the "adverse spousal testimony privilege (or the anti-marital facts privilege)." *United States v. Seminole*, 865 F.3d 1150, 1151–52 (9th Cir. 2017). The privilege "permits a witness to refuse to testify against his or her spouse." *Id.* at 1152. "[T]he witness-spouse alone has a privilege to refuse to testify adversely; the witness may neither be compelled to testify nor foreclosed from testifying." *Trammel v. United States*, 445 U.S. 40, 53 (1980). But here, because Ayvazyan is the "witness," Terabelian cannot invoke the privilege. The privilege, moreover, protects "the spouse's testimony in the courtroom," not Ayvazyan's statements made at the Miami International Airport. *See id.* at 52 n.12.

And even if Terabelian did have standing to challenge the inclusion of the Amaya loan, *Kastigar v. United States*, 406 U.S. 441 (1972), would foreclose her challenge. *Kastigar* clearly prohibits "prosecutorial authorities from using the compelled testimony in any respect," thus "insur[ing] that the testimony cannot lead to the infliction of criminal penalties on *the witness*." 406 U.S. at 453 (emphasis added). But Terabelian's compelled password disclosure did not result in the discovery of the Amaya loan; Ayvazyan's password disclosure did. Terabelian is therefore not the witness that *Kastigar* protects. We would therefore have affirmed the judgment of the district court and found that it did not abuse its discretion in including the Amaya loan in Terabelian's restitution amount had we not dismissed

her appeal on the basis of the fugitive-disentitlement doctrine.

## IV.    CONCLUSION

For all of the foregoing reasons, we apply the fugitive-disentitlement doctrine and DISMISS Terabelian's appeal.